Filed 8/1/16  In re E.W. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re E. W., a Person Coming Under the Juvenile Court Law. | D069675 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. EJ3972A-B) |
| v. | |
| I. F., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Kimberlee A. Lagotta, Judge.  Affirmed.

Jesse McGowan, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Kristen Ojeil, Deputy County Counsel, for Plaintiff and Respondent.

Julie E. Braden, under appointment by the Court of Appeal, for Minors.

I.F. (Mother) had numerous children, including her then-14-year-old son E.W. (Son) and her then-12-year-old daughter N.F. (Daughter), when San Diego County Health and Human Services Agency (Agency) filed a petition under Welfare and Institutions Code[1] section 300, subdivision (b), alleging that Mother's repeated exposure to domestic abuse required removal of her children from her care. The court made true findings on the petition, removed custody from Mother, placed Son and Daughter with their father (Father) in Alabama, and terminated jurisdiction with custody orders.

Mother does not contest the propriety of the true findings on the petition. Instead, Mother challenges only the dispositional order, asserting two different claims. First, she argues the evidence was insufficient to support removal of Son and Daughter from her custody because (1) there was no evidence an order that would have placed Son and Daughter in her care would have created a substantial danger to their physical or emotional well-being, and (2) the evidence did not support the court's implied finding that reasonable efforts had been made to prevent or eliminate the need to remove Son and Daughter from Mother's custody. Mother also asserts, in an argument joined by Son and Daughter on appeal, the court abused its discretion when it denied a motion made jointly by Mother, Son and Daughter to continue the dispositional phase of the hearing to allow additional information to be obtained to evaluate Father's new home, and that denial of the continuance was prejudicial error.

---

[1] All statutory references are to the welfare and Institutions Code.

2

I

FACTUAL CONTEXT

A. Mother's History

Mother has a long history of being involved in relationships with men who have physically abused her. Mother was involved with Father in the early 2000's while living in Texas, and she claimed the history of domestic violence between them was "extremely bad."[2]

Mother (then pregnant with Daughter) left Texas in 2003 and returned to San Diego with Son. Shortly after Daughter was born, Mother participated in her first voluntary case with Agency after Daughter suffered a femur fracture while in the care of a maternal aunt, and Mother received referrals to services in the community and other services.

Mother's next round of voluntary services arose when another abusive partner, Leonard M., attacked her in early 2012. After an argument escalated, he pushed her to the ground, choked her, punched her six or seven times, and forcibly prevented her from calling 911. Leonard M.'s cousin and her boyfriend were present in the home and intervened, pulling Leonard M. off of Mother, who was transported to the hospital. A

---

[2] The evidence was in dispute as to the extent of the violence between Father and Mother. Mother claimed he beat her when she was pregnant and strangled her on one occasion so badly that she almost died. She also claimed Father killed their two dogs and threatened her with the same fate if she tried to leave him, and also claimed Father put out cigarettes on Son during his infancy. Father stated there was only one incident of domestic violence, and Mother went to a shelter as a result of that incident. He admitted he killed their dogs but did so because they had rabies.

criminal protective order (CPO) was put in place, and Mother received additional voluntary services, after which the case was closed in November 2012. Agency subsequently offered her a third voluntary case after they learned, among other things, that Mother was permitting Leonard M. to visit in violation of the CPO and also permitting the relative who injured Daughter to live with Mother and Daughter. However, Mother declined to cooperate in these efforts.

B. The Triggering Incident

The present matter commenced as the result of a September 2015 incident involving Leonard L. Before the September 2015 incident, Mother had been involved in at least two prior confrontations with him. The first occurred in 2010 when they argued and he punched her, and then dragged her outside and struck her again. Both Son and Daughter witnessed this incident. The second occurred in June 2015, when an intoxicated Leonard L. punched two television sets in the home and punched Mother in the shoulder. During the latter incident, again witnessed by both Son and Daughter, a sibling (L.) was asleep on the ground and one of the television sets struck by Leonard L. fell and almost struck L.

In the September 2015 incident, Leonard L. angrily woke up Mother over a problem with the internet connection. He punched a television set and mirror, threw a speaker through a window, and fled before police arrived. Although the home was left in a state of disarray, with Leonard L.'s blood on some of the items, a police report noted Mother did not sustain any physical injuries during this incident.

4

At the time of the incident, Son and Daughter were home. The maternal grandmother, who was residing in the home, reported that neither Son nor Daughter actually witnessed the incident. However, Son heard the incident and picked up a stick to intervene to protect Mother, but the maternal grandmother instructed Son to stay on the couch and not intervene. Son reported that it was not safe in the home and was concerned for Mother's safety.

After this incident, a social worker with Agency tried to implement a safety plan that required Mother to apply for a restraining order against Leonard L. However, when Mother did not seek a restraining order and continued to allow Leonard L. into the home, Agency sought and secured a protective custody warrant in the juvenile court.

C. The Jurisdictional and Dispositional Hearings

*Dependency Petition*

On September 24, 2015, Agency filed a dependency petition on behalf of all of Mother's children. In a single count, Agency described the domestic violence perpetrated by Leonard L. against Mother, alleged that he abused alcohol, and alleged Mother had a history of being unable to protect Son and Daughter from domestic violence. At a detention hearing held September 28, 2015,[3] the juvenile court found a prima facie basis

---

[3]    Mother finally filed a request for a restraining order on the day of the detention hearing. The juvenile court granted her request for a temporary restraining order, but found that it was insufficient to avoid detention.

to detain the children and detained all of the children out of Mother's home,[4] and set a jurisdiction and disposition hearing.

*The Jurisdictional Hearing*

On November 24, 2015, the juvenile court conducted a jurisdictional hearing. Based on the documentary evidence, as well as testimony from the social worker, the court sustained a modified version of the dependency petition. Father appeared telephonically, and the court elevated Father's paternity status to that of a presumed father for Son and Daughter. Father's counsel announced Father would be requesting custody of Son and Daughter under section 361.2.[5] Father was aware Son and Daughter did not want to live with him but was hoping to resolve the "parental alienation."

Agency's report indicated there were no current concerns regarding Father, who expressed a desire for custody of Son and Daughter, but noted Father had not seen Son and Daughter in over five years, was currently unable to care for them until he addressed the problems with his housing, and both children stated they did not want to live with him. Agency recommended supervised visits until more information could be obtained about Father. County counsel argued against placement with Father because there was no indication that he participated in any services.

---

4    One child was placed with her father, and the others (including Son and Daughter) were detained in foster homes.

5    The court also conducted a dispositional hearing for the younger siblings of Son and Daughter. As to two of the siblings, the juvenile court terminated jurisdiction after placing them with their respective fathers. The juvenile court maintained the youngest child in foster care with reunification services in place for Mother and Leonard L.

Based on the documentary evidence,[6] as well as testimony from the social worker that the risk of reoccurring domestic violence between Leonard L. and Mother was "very high," the juvenile court sustained a modified version of the dependency petition. However, the juvenile court also granted a request for a 30-day continuance of the dispositional hearing as to Son and Daughter to allow a further assessment of Father and to get an updated recommendation from Agency.

*The Contested Dispositional Hearing*

Agency, in its final addendum report prepared for the contested dispositional hearing on January 19, 2016, recommended placing Son and Daughter with Father and terminating jurisdiction.

Agency's report contained Father's complete criminal history; negative drug test results for Father; observations of two supervised visits between Son, Daughter and Father; and reports of the interviews with Father, Father's relatives, Mother, Mother's service providers, and the caregiver. Agency determined Father had no child welfare

---

[6]     In a report dated October 14, 2015, the social worker reported on her interviews with Mother, Father, Son and Daughter. Mother claimed Leonard L. never touched her during the September incident and had no recollection of him touching her during the June 2015 incident, and claimed she has not seen him since the incident. However, Daughter reported, during an October 6, 2015, interview, that Leonard L. had wanted to see his daughter so Mother let him come over and spend the night one week earlier, and Daughter heard them yelling at each other. Daughter also reported she was scared when the fighting occurred and she would lock herself and her sisters in their respective rooms while the fights were occurring and they had a secret knock to get into each other's bedrooms. In an addendum report dated November 12, 2015, Agency also reported on the competing claims of Mother and Father concerning Father's misconduct toward her while they were together. (See fn. 1, *ante*.)

history in Texas. He was arrested on several occasions between 1994 and 2011, but apparently had only a single adult conviction (a 2011 misdemeanor conviction for the possession of marijuana) for which he was sentenced to 60 days in jail.[7] However, Father submitted to a drug test, which came back negative.

Father reported that he used to discipline Son by sending him to his room, and Father admitted to one incident (which Father regretted) when he spanked Son with a belt after discovering Son had forged Father's signature. After his relationship with Mother ended, he married another woman and stayed with her for about three years. There was no domestic violence or concerns about their 10-year-old daughter during that relationship.

Agency's report indicated Father planned to move into a four-bedroom home in Alabama with a paternal aunt, Megan W. (C.T. pp. 133, 135), and Son and Daughter would have separate rooms. Father planned to work with Megan's husband as a welder. By the time of the dispositional hearing, Father had in fact accomplished the predicted move and was living with Megan W. in her Alabama home.

---

[7] In 1995, when Father was a minor, he was the subject of a delinquency petition charging him with lewd and lascivious acts upon a child under the age of 14. Father explained that, when he was 15, he was watching his five-year-old sister when she peed on herself and he went to clean her. His sister then told a grandmother that it burned where he wiped. Grandmother, who hated Father and once told him she "wished he was never born," then "freaked out" and had him arrested. The petition was apparently sustained because Father was sent to Juvenile Hall and completed group counseling for teenage sex offenders. A paternal great aunt from Alabama, Yolanda R., confirmed Father's account, and Yolanda (who had known Father all his life) had no concerns about children being in his care.

In December 2015, Father travelled to San Diego to meet with the social worker and participate in two supervised visits with Son and Daughter, although Daughter could not attend the second visit because she was at camp. Father was positive and appropriate during these visits, one of which the social worker described as going "extremely well," and Son and Daughter appeared to enjoy the visits. Father also began telephoning Son and Daughter each evening, and the caregiver reported they seemed to be bonding with Father.

The report indicated Son (a freshman in high school) had no concerns about living with Father but would rather stay in San Diego, and the 12-year-old Daughter also preferred to remain in San Diego. Staying in San Diego remained their consistent desire when talking to the social worker (5.R.T. p. 17.)

Agency's report noted Mother was making progress in her services. Her private therapist reported she was "open and engaged in therapy" when "discussing the issue of domestic violence as well as her childhood trauma." The therapist believed Mother would not allow Son and Daughter to have contact with Leonard L. if Mother was granted "unlimited supervised visits." Mother also indicated she would begin therapy with a TERM therapist as well.

Mother's domestic violence group facilitator reported she began the group on October 19, had come to all of the groups, and was an active participant who "acknowledges she needs help, is open to feedback and talks about her past abuse." Mother also reported she was no longer having contact with Leonard L., had obtained a

9

restraining order against him, and indicated she was "never again going to risk losing her kids."

On January 19, 2016, the juvenile court held the contested disposition hearing. Preliminarily, the court heard argument on a request for a continuance, requested jointly by Son, Daughter and Mother, that would allow Son and Daughter to visit Father and the relatives in Alabama and allow confirmation of the status of the home environment. Son and Daughter's attorney stated during her argument for a continuance that she did not believe there would be detriment to them were they placed with Father, but simply wanted a visit to facilitate a successful transition for Son and Daughter. Mother's attorney noted a continuance to allow the visit, with the social worker accompanying Son and Daughter on that visit, was appropriate because "we don't even know if this home has working electricity, water, or anything," and the social worker could then report back on the condition of the home. Agency opposed the continuance, noting (among other things) that because of Son's and Daughter's ages social workers would not accompany them on that visit.

In denying the continuance request, the juvenile court stated:

> "I'm not inclined to grant a continuance of the trial. I feel that there has been sufficient notice to all parties of the current recommendation, and I think that we are here for purposes of trial, which does give all sides an opportunity to call witnesses, and to address concerns with respect to a disposition. . . . [¶] . . . [¶] . . . I don't want to give the kids the impression that there is detriment, when there's not, and that somehow this visit would empower them to make a different finding or to impress upon the court to make a different finding. . . . I'd rather . . . [take] evidence today and [find] out about the suitability of the home . . . as opposed to putting off to another day what we can address today "

10

The court, after admitting numerous documents into evidence, heard testimony from social worker Lowrimore and Father. Lowrimore testified that Mother was doing "fairly well" in her services by the time of the contested disposition hearing, including participation in individual therapy with her own therapist and a domestic violence group. Lowrimore could not say Mother had made "good progress" in her individual therapy yet, because her therapist had limited information about the case when she provided feedback. Lowrimore did feel Mother's decision to seek out a TERM therapist, in addition to her private therapist, was a positive step. Although Lowrimore recommended unsupervised visits between Mother, Son and Daughter, because Lowrimore had "no concerns, whatsoever, of [Mother] ever hurting her children," her recommendation for unsupervised visits included a condition that Leonard L. "should never, ever be around the children."

Lowrimore also testified regarding the basis for the recommendation of removal from Mother. Lowrimore remained concerned regarding Mother's lack of insight into the seriousness of the domestic violence incident and existing relationship problems, Mother's history of engaging in domestic violence, and Mother's failure to follow through with a restraining order and instead allowing a domestic violence perpetrator back into the home. Agency remained concerned about Mother's allowing Leonard L. into the home.

Lowrimore also testified about Agency's recommendation to place Son and Daughter with Father and terminate jurisdiction. She considered numerous factors when

making her recommendation, including: feedback from Father and his relatives; Father's coming to visit Son and Daughter in San Diego when offered an opportunity to do so, and the positive nature of those visits; Mother had not expressed any concerns regarding Father's relatives in Alabama; Father has done everything asked of him by the Agency thus far; and, ultimately, Lowrimore saw no detriment to Son and Daughter if placed with Father. The Agency made its recommendation knowing Son and Daughter expressed that they did not wish to live with Father on multiple occasions,[8] and knowing there was no third-party evaluation of Megan W.'s home.

Father testified he made the planned move into a four-bedroom home in Alabama with his aunt, Megan W., her husband and her son on January 16. He was currently putting in applications for work, in addition to the application for the welding job with his uncle. The home had electricity, heat and running water. Once Father obtained employment, he would ensure Son's and Daughter's rooms were fully furnished, though they already had their own rooms and a place to sleep and his aunt indicated she would help him to get some additional furniture. He identified which schools they would attend and indicated the neighborhood was very quiet and peaceful, with "plenty of space to run around and play."

---

[8]     Lowrimore suspected Son and Daughter had been subjected to parental alienation, which she described as "[w]here one parent, or both, . . . are saying negative things about the other . . . [a]nd then the children are swayed over to their side . . . [¶] . . . [¶] . . . making a choice."

Father indicated he had a "wonderful visit" with Son and Daughter, and especially enjoyed his personal time with Son. He testified that if Son and Daughter had a difficult time transitioning, he would assist them and "do whatever [was] in [his] power to make them feel comfortable." He planned to give Son and Daughter their own cell phones, had no problem with Mother coming to Alabama to visit them "anytime she want[ed] to," and was prepared to follow and enforce any court orders.

After the close of evidence and hearing arguments from all counsel, the court entered its findings and orders relating to disposition. The court followed the Agency's recommendations, removed custody from Mother, placed Son and Daughter with Father, and terminated jurisdiction. In making its findings of removal from Mother, the court stated it had "grave concerns about [M]other's history of domestic violence. The fact that the children were present during the current incident, witnessed the domestic violence, as well as the injuries to [Mother]. The emotional detriment that children being witness to domestic violence has been, by every study indicated, as very detrimental to the physical health and the emotional well-being of children. [¶] Further, I'm concerned about the fact that during the last incidents of domestic violence, where [M]other does have quite a history, but, in this case with Mr. [L.], that the domestic violence involved vandalizing property in the home and injuries to [Mother]. Because the children [were] present during an incident such as that, the children could also be physically injured as a result of domestic violence."

Additionally, as to placement with Father, the court found Father "has an appropriate residence, he has appropriate family support, he has a job at this time in the

13

interim, while the children [are] placed with him. He's also continuing to look for employment. He's indicated that he has—is in process of making arrangements for the children's education at the local schools, where he is currently residing. And he is in process of furnishing the residence, so it will be appropriate for the children when they arrive. [¶] There is nothing before the court at this time which would indicate by clear and convincing evidence that it would be detrimental to place the children with [F]ather."

The court removed custody from Mother and placed Son and Daughter with Father, entered a visitation order allowing unsupervised visits with Mother on condition Leonard L. was not present, and terminated jurisdiction. Mother timely appealed.

II

CHALLENGE TO REMOVAL ORDER

Mother contends the court erred in removing Son and Daughter from her custody. She recognizes the jurisdictional finding provided prima facie evidence Son and Daughter could not safely remain in the home (§ 361, subd. (c)(1); *In re John M.* (2012) 212 Cal.App.4th 1117, 1126), but argues that before a child can be removed, the court must find by clear and convincing evidence that (1) there is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the child if returned to the home, and (2) that no reasonable means are available by which the child can be protected without removal. (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1163.) She argues there was no substantial evidence to support either finding because (1) Son's and Daughter's ages meant they were not vulnerable to suffering any harm from domestic violence, and (2) there were reasonable alternatives to removal in this case

14

because Mother had made progress in her services and the court could have ensured Leonard L. stayed away from the home by ordering unannounced visits and/or conditioning a return of Son and Daughter on the presence of another adult in Mother's home.

A. Removal Orders at Disposition and Standard of Review

Once the court made a true finding at the jurisdictional phase, the court was then required to consider whether Son and Daughter should be declared dependents and whether they would be at substantial risk of harm if not removed from the parent's care. (§§ 358, subd. (a), 360, 361; see *In re Austin P.* (2004) 118 Cal.App.4th 1124, 1129.) Here, the court removed physical custody of Son and Daughter from Mother under section 361, subdivision (c)(1), which provides, in relevant part:

> "(c) A dependent child shall not be taken from the physical custody of his or her parents . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence of any of the following circumstances . . . : [¶] (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody."

The court must also "make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for the removal of the minor from his or her home . . . ." (§ 361, subd. (d).)

The juvenile court has broad discretion in crafting a disposition pursuant to a child's best interests. (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1179; *In re*

15

*Christopher H.* (1996) 50 Cal.App.4th 1001, 1006.) There is no requirement the parent be dangerous or that the child suffer actual harm prior to removal. The focus of the removal statute is on averting harm to the child. (*In re Jamie M*. (1982) 134 Cal.App.3d 530, 536, citing *In re B.G.* (1974) 11 Cal.3d 679, 698-699.)

When the court removes a child from parental custody at disposition, the substantial evidence standard of review is used to determine whether the court's decision should be upheld. (*In re T.V.* (2013) 217 Cal.App.4th 126, 136 (*T.V.*).) Substantial evidence is evidence that is reasonable, credible, and of solid value. (*In re Veronica G.* (2007) 157 Cal.App.4th 179, 185.) When a parent challenges an order on the grounds of insufficient evidence, the appellate court reviews the evidence in the light most favorable to the juvenile court's order, drawing every reasonable inference and resolving all conflicts in favor of the prevailing party. (*In re D.M.* (2012) 205 Cal.App.4th 283, 291.) The parent has the burden to demonstrate there is no evidence of a sufficiently substantial character to support the juvenile court's order. (*Ibid*.)

B. The Order Removing Son and Daughter from Mother's Custody Is Supported by Substantial Evidence

Mother contends the court erred in removing Son and Daughter from her custody because they were beyond the age that would make them vulnerable to domestic violence. However, the evidence showed they were present during multiple incidents of domestic violence, involving both extensive destruction of property and injuries to Mother, and the court could well infer this was a recurring pattern in Mother's life and its

16

recurrence posed a substantial danger to both the physical and emotional well-being of Son and Daughter.[9]

The decisions in *In re J.S.* (2014) 228 Cal.App.4th 1483 and *T.V., supra,* 217 Cal.App.4th 126, support the court's order. In *J.S.,* the court held that "[o]ngoing domestic violence, committed by both parents, in the presence of the children, from 2008 through 2012, [was] substantial evidence of a substantial danger to the children's emotional well-being, if not their physical well-being." (*J.S.,* at p. 1494.) Similarly, in *T.V. ,* this court upheld an order removing custody of the child from the father, even though the child had not been physically injured, "because the evidence showed the parents engaged in a pattern of domestic violence, some of which [the child] heard or saw; thus, she was at substantial risk of harm if returned home." (*T.V., supra,* 217 Cal.App.4th at p. 136.) Although Mother argues the young ages of the children in both *J.S.* and *T.V.* renders them distinguishable, neither court distinguished between the ages of those children versus older children in making their respective holdings. Moreover, there was substantial evidence from which a court could conclude their ages did not insulate them from the danger of harm to their physical and emotional well-being from the recurring domestic violence plaguing the home. The emotional detriment included

---

9      It is appropriate for the court to consider a parent's past conduct as well as present circumstances. (*In re Maria R.* (2010) 185 Cal.App.4th 48, 70, disapproved on other grounds by *In re I.J.* (2013) 56 Cal.4th 766, 780-781; *In re Troy D.* (1989) 215 Cal.App.3d 889, 900.) A parent's past conduct is a good predictor of future behavior. (*T.V., supra,* 217 Cal.App.4th at p. 133; *In re Petra B.* (1989) 216 Cal.App.3d 1163, 1169.)

17

evidence Son said he did not feel safe in the home prior to being removed by the Agency, and Daughter reported she was scared when the fighting occurred to the extent she and her siblings sought shelter during the fights by locking themselves in their respective rooms (and had developed a secret knock to get into each other's bedrooms). Moreover, there was some evidence the recurring domestic violence posed a danger of physical harm to Son and Daughter, because the June 2015 incident involved a sibling who was nearly struck by a falling television set when Leonard L. erupted, and during the September 2015 incident Son had to be dissuaded by a maternal grandmother from intervening (thereby exposing himself to the risk of physical harm) in an attempt to try to protect Mother from an enraged Leonard L.

Mother relies on *In re Hailey T.* (2012) 212 Cal.App.4th 139 (*Hailey T.*) to argue that the ages of Son and Daughter, and their concomitant ability to protect themselves from becoming collateral damage during domestic violence incidents, shows there was no substantial evidence there was any substantial danger to their physical or emotional well-being if domestic violence recurred. However, *Hailey T.* has no applicability here. In *Hailey T.,* a four-month old sibling suffered an eye injury, and although there was substantial dispute over how that injury occurred (*id.* at p. 148), there was no evidence Hailey had ever been abused or evidence of any physical violence between the parents (or any substance abuse or mental health problems), Hailey had a healthy relationship with the parents, attended school and was social and outgoing. On that record, this court reversed a removal finding because substantial evidence did not support the order removing Hailey. (*Id.* at pp. 147-148.) In contrast, the children here were removed based

18

on a long history of recurring domestic violence in the presence of the children, which is an appropriate basis for removal from custody. (*In re Heather A.* (1996) 52 Cal.App.4th 183.)

Mother argues her progress in services undermined Agency's case for removal because there was evidence that, by the time of the contested disposition hearing, Mother was making progress in her services with five months of counseling and three months of participation in a domestic violence group. Although aware of Mother's individual and group therapy sessions, Lowrimore remained concerned for Son and Daughter because (1) Mother lacked insight into "how serious [the domestic violence incident] was," (2) Mother had a history of engaging in domestic violence, and (3) despite the pendency of the present action Mother did not follow through with a restraining order and instead allowed Leonard L. back into the home. The juvenile court heard Lowrimore's testimony, and therefore had an evidentiary basis for giving little weight to Mother's recent progress in services (particularly when Mother elected to drop the restraining order and allow Leonard L. back into the home again even after she commenced these services), and this court cannot reweigh or reevaluate that evidence. (See *In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53 ["It is the trial court's role to assess the credibility of the various witnesses, to weigh the evidence to resolve the conflicts in the evidence. We have no power to judge the effect or value of the evidence, to weigh the evidence, to consider the credibility of witnesses or to resolve conflicts in the evidence or the reasonable inferences which may be drawn from that evidence."].)

Mother also contests one factual finding made by the court and argues the absence of evidentiary support for this "key" finding undermines the court's ultimate ruling removing Son and Daughter from her custody. Mother references the juvenile court's statement that it:

> "has grave concerns about [M]other's history of domestic violence. The fact that the children were present during the current incident, witnessed the domestic violence, *as well as the injuries to* [*Mother*]. The emotional detriment that children being witness to domestic violence has been, by every study indicated, as very detrimental to the physical health and the emotional well-being of children. [¶] Further, I'm concerned about the fact that during the last incidents of domestic violence, where [M]other does have quite a history, but, in this case with Mr. [L.], that the domestic violence involved vandalizing property in the home *and injuries to* [*Mother*]. Because the children [were] present during an incident such as that, the children could also be physically injured as a result of domestic violence."

Mother notes the police report from the September 2015 incident shows she suffered no injuries, and therefore the evidence does not support a contrary finding. However, we are convinced that Son and Daughter were removed from the home because of ongoing domestic violence between Mother and Leonard L. and the potential for harm to them as the result of that violence, and not because of the extent Mother suffered significant physical injuries during the altercations.[10] We therefore conclude substantial

---

10    Moreover, it can be inferred the court mistakenly referred to Mother having been "injured" in relation to "the current incident" because the petition was amended to encompass conduct that included the June 2015 incident in which Leonard punched Mother. When it made the removal order, the court referred to both to the "current incident" as well as "the last incidents," indicating it understood there was more than one incident of domestic violence, and also referenced injuries in the context of "the last

20

evidence supports the findings that removal was appropriate because there is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of Son and Daughter were they returned home.

  C. <u>The Court Properly Considered Whether There Were Reasonable Means to Prevent the Removal</u>

  Mother claims the order must be reversed because the court did not consider alternatives to removal. However, the court explicitly found removal was required in this case pursuant to section 361, subdivision (c)(1), which includes an implied determination that there were no reasonable means by which the child's physical or emotional health may be protected without removing the child from the physical custody of the parent. Under the doctrine of implied findings (see, e.g., *In re Corienna G.* (1989) 213 Cal.App.3d 73, 83), the court's ruling necessarily included the determination that there were no reasonable means by which Son's and Daughter's physical or emotional health could be protected without removing them from Mother's physical custody.

  Mother contends no substantial evidence supports that implied finding because removal would not have been necessary if Agency conducted unannounced visits to her home or conditioned return to Mother's home on the presence of another adult in the home. Mother made neither of these arguments below, which ordinarily forfeits this argument on appeal. (Cf. *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1138.) More importantly, even assuming this argument was preserved, there was substantial

---

incidents." We cannot fault the court for melding together the various incidents when it referred to mother's injuries.

evidence from which a trier of fact could have concluded that neither alternative provided a *reasonable* means of protecting Son's and Daughter's physical or emotional health while they remained in Mother's physical custody. For example, Mother argues on appeal that the maternal grandmother could be the other adult to reside in the home and "ensure that Leonard L. did not return." Of course, Mother did not suggest this option at trial, nor does she indicate how the court could have ordered the maternal grandmother (a nonparty to the proceeding) to remain in Mother's home as a warden. More importantly, there was some evidence that would permit a trier of fact to have concluded this option would have been ineffective: the maternal grandmother was living in the home at the time of the domestic violence incident in September 2015 and was present for the incident, and her presence did not prevent the violence from occurring; and presumably the maternal grandmother was still living there in October 2015 when Mother again permitted Leonard L. into their home.[11] We conclude Mother has not met her burden of showing that no substantial evidence supported the order entered below.

---

[11] Mother also does not explain how "unannounced visits" would have ensured she would have prevented Leonard L. from returning to the home, particularly when the only impact that condition might have had would have been an *in terrorem* impact on Mother's behavior, and she had already shown the *in terrorem* impact of the pending proceedings was ineffective because she did *not* stop Leonard L. from coming back into her home in October 2015. Although Mother relies on *In re Ashly F.* (2014) 225 Cal.App.4th 803 to argue the court could have alleviated the need for removal by imposing "unannounced visits," that case is distinguishable because the *Ashly F.* court reversed the trial court's order removing the children from their home because the report in *Ashley F.* did not include the mandated information on what reasonable efforts had been made to prevent or eliminate removal. (*Id*. at pp. 809-810.) In contrast, Agency's report did include a detailed discussion of the services offered in an attempt to prevent removing Son and Daughter, including referrals to individual therapy services, domestic violence group

III

CHALLENGE TO DENIAL OF CONTINUANCE

Mother, in an argument joined in by Son and Daughter on appeal, asserts the trial court abused its discretion when it denied a motion made jointly by Mother, Son and Daughter to continue the dispositional phase of the hearing.[12] They also assert the continuance was necessary to allow additional information to be obtained to evaluate Father's new home, and to allow trial counsel for Son and Daughter to make an informed recommendation as to the appropriate disposition. They assert the erroneous denial of the continuance was prejudicial error because it is reasonably probable the court would have entered a different dispositional order had the information they sought during this continuance—an evaluation of Father's new home—been available at trial.

---

therapy, and parenting education in 2012 relating to her voluntary case; the option to receive referrals in late 2013 to which Mother did not respond; the referrals provided in the instant case; the encouragement to pursue a restraining order, etc. Because Agency's report was replete with the efforts made, *Ashly F.* provides no aid to Mother's argument either that the court did not consider whether there were reasonable means of protecting Son's and Daughter's physical or emotional health while they remained in Mother's physical custody or that there was no substantial evidentiary support for the court's implied adverse finding on this issue.

[12] As a preliminary matter, Agency contends Mother does not have standing to assert error insofar as Mother claims the lack of a continuance deprived trial counsel for Son and Daughter the opportunity to obtain additional information to fully discharge counsel's obligations in representing their interests. Although one court has concluded a parent does not have standing to assert the child's counsel provided inadequate representation to the child in a dependency proceeding (*In re S.A.* (2010) 182 Cal.App.4th 1128, 1134), Mother's interest in the dispositional order is sufficiently personal that she may assert the court's ruling on the continuance was erroneous. (Cf. *In re Frank L.* (2000) 81 Cal.App.4th 700, 703.) Moreover, because counsel for Son and Daughter has also raised the issue, we reach the claim on its merits.

23

A. <u>Legal Framework</u>

Section 358 outlines the procedures for conducting a dispositional hearing after the jurisdictional phase. The juvenile court may continue the dispositional hearing on its own motion, or on motion of any party, provided that certain time constraints are observed.[13] (§ 358, subd. (a)(1) & (2).) In considering a continuance request, the juvenile court must give substantial weight to the child's need for the prompt resolution of his or her custody status and to the damage of a prolonged temporary placement. (§ 352, subd. (a).) "Continuances are discouraged in dependency cases" (*In re Giovanni F.* (2010) 184 Cal.App.4th 594, 604), and a request to extend the dispositional hearing beyond 60 days after the child's detention should be denied absent exceptional circumstances. (§ 352, subd. (b); *In re Giovanni F.,* at pp. 604-605.)

A ruling on a continuance request is reviewed for an abuse of discretion. (*In re Giovanni F., supra*, 184 Cal.App.4th at p. 605.) An abuse of discretion is shown when the court exceeded the bounds of reason or made an arbitrary, capricious, or patently absurd determination. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.)

---

[13] The party requesting a continuance ordinarily must file a written motion with supporting affidavits at least two court days prior to the hearing unless there is good cause to entertain an oral continuance motion. (§ 352, subd. (a); *In re Julian L.* (1998) 67 Cal.App.4th 204, 208.) Although no written motion was filed, Agency did not object on that basis and the court entertained the motion, and Agency does not claim on appeal that the ruling on the motion should be upheld based on this procedural defect.

B. Procedural Context

At the beginning of the dispositional hearing in this case, which occurred nearly four months after they were initially detained, Son and Daughter's counsel (joined by Mother's counsel) asked for a second continuance of the dispositional hearing.[14] The articulated basis raised by minors' counsel was that, although the visits between Son, Daughter and Father went well, Son and Daughter did not want to go to Alabama, and a continuance would allow Son and Daughter to visit Father in Alabama to "get comfortable . . . so that hopefully this can be a successful transition," but that if they did not visit Father in Alabama prior to their placement, "I'm not sure what the kids' reactions will be [and] my hope [is that a visit] will make things a little bit smoother of a transition." He also noted that Father had recently accomplished the planned move to Megan W.'s home, and "if the Agency was able to [accompany] the kids [on this test visit], . . . they could . . . confirm that it's . . . what the father says it is." Mother's counsel, joining the request, expressed her concerns that the home in Alabama was a "much smaller place" than what Father and his relatives had represented, and "[w]e don't even know if this home has working electricity, water, or anything."

Agency opposed the continuance, pointing out that Mother had spoken positively about Father's aunts and had never express any concerns about the aunts or their homes, including the home into which Son and Daughter would be moving. Agency also noted

---

14    The dispositional hearing had originally been scheduled for November 24, 2015. However, the court granted a continuance of that hearing to permit Agency the opportunity to evaluate placement with Father.

that having a test visit could make the transition even more difficult if Son and Daughter returned from that visit but remained opposed to the move. Finally, Agency pointed out that Father could testify about the home, and possibly have photographs of the home sent to the court, and delaying the hearing would not produce any additional information because even if the hearing were delayed to allow Son and Daughter to "visit" prior to the placement, a social worker would not accompany them on such a visit to inspect the home. The court denied the motion for a continuance.

C. Analysis

We conclude Mother has not shown that denial of a *second* continuance of the dispositional hearing, based on a newly articulated suspicion that the home into which Father had moved might be shown to be inadequate if Mother, Son or Daughter had more time to gather additional information about that home, was an abuse of discretion. First, the court had already granted a nearly two-month continuance of the dispositional hearing to allow investigation into whether it would be detrimental to Son and Daughter to place them with Father. During this period, Mother never expressed any concerns to Agency about Father's planned move into his aunt's home, and neither Mother nor Son and Daughter provided any articulated basis (other than pure speculation) that an additional period of delay would have produced any evidence that the home into which he had moved was anything other than an appropriate home for them.[15] Second, Father was

---

[15] Indeed, there was evidence the suggested delay would have been fruitless. The only *additional* investigation suggested by either Son and Daughter or Mother that could be harvested during this additional delay was that the social worker could accompany

available to—and did—testify at the dispositional hearing, including testimony about the quality of the home in which he was living, and neither Mother nor Son and Daughter's attorney sought to cross-examine him to undermine that testimony, or chose to ask Father or Megan W. for photographs (as suggested by Agency to allay any concerns) to verify the condition of the home. We cannot conclude that, on this showing, it was an abuse of the court's discretion to further delay the dispositional hearing to allow a fishing expedition as to the condition of the home.[16]

Here, the *principal* articulated basis for the continuance was that, because they did not want to move to Alabama, a continuance to allow an additional visit between Son, Daughter and Father might allow them to become "comfortable . . . so that hopefully this can be a successful transition." However, as the court noted in denying the request, it was already aware of Son's and Daughter's preferences but did not "want to give the kids

_____

them on a visit and report back on Father's new home. However, Agency explained it would *not* send a social worker to Alabama even were the court to order an additional test visit. Thus, the court could well have concluded the delay would not have borne any new information. Although Mother implies on appeal that the court should have granted the continuance to facilitate an expedited request under the Interstate Compact for the Placement of Children (ICPC) to further investigate Father's circumstances, "compliance with the ICPC is not required for placement with an out-of-state parent. . . ." (*In re John M.* (2006) 141 Cal.App.4th 1564, 1575.) Moreover, because neither Mother nor Son and Daughter suggested the continuance was necessary to allow for proceedings under the ICPC, any claim on appeal that it was an abuse of discretion to deny the continuance in order to pursue ICPC proceedings is forfeited. (*In re Anthony P.* (1995) 39 Cal.App.4th 635, 641.)

16      Moreover, even assuming Mother, Son or Daughter did avail themselves of a subsequent investigation and did uncover evidence the home was in fact unsuitable or some other evidence as to Father suggesting placement with him was detrimental to the best interests of Son and Daughter, Mother could seek a modification of the placement order. (Cf. *In re Marriage of David & Martha M.* (2006) 140 Cal.App.4th 96.)

the impression that there is detriment, when there's not, and that somehow this visit would empower them to make a different finding or to impress upon the court to make a different finding. . . ."  Neither Mother nor Son and Daughter suggest this was an arbitrary, capricious, or patently absurd reason for the court's denial of the continuance, and we therefore conclude the court did not abuse its discretion in denying the continuance.

## DISPOSITION

The orders are affirmed.

McDONALD, Acting P. J.

WE CONCUR:

O'ROURKE, J.

AARON, J.